Order affirmed, with $10 costs and disbursements. All concur.

---

## In re PECK'S ESTATE.

(Supreme Court, Appellate Division, Fourth Department. June 18, 1898.)

1. EXECUTORS—INVESTMENT BY CO-EXECUTOR—JOINT LIABILITY.
    Where one executor had the principal management of the estate, but submitted to his co-executrix a statement showing investments, some of which were illegal, and, except when she was absent, he consulted with her as to all investments, and she took in her own name certain of the illegal investments, her concurrence is inferred, and she is jointly chargeable for the breach of trust in making such investments.

2. SAME—BENEFICIARIES—ESTOPPEL.
    Where a co-executrix was also principal beneficiary, and concurred in the making of illegal investments by the other executor, she is estopped as beneficiary from questioning their legality.
    Green, J., dissenting.

Appeal from surrogate's court, Onondaga county.

Judicial accounting by Wilbur S. Peck and Elizabeth R. Peck, executor and executrix of the will of Frank A. Peck, deceased. Objections were filed by Elizabeth R. Peck individually and George H. Sears, special guardian; and, from the decree settling the accounts, Wilbur S. Peck appeals. Reversed.

The testator, Frank A. Peck, died at the city of Syracuse on the 17th day of January, 1890, leaving a last will and testament, in and by which he nominated and appointed his brother, Wilbur S. Peck, and his wife, Elizabeth R. Peck, the executors thereof. On the 10th day of February, following, letters testamentary were duly issued to the above-named executors by the surrogate of Onondaga county, and they thereupon entered upon the discharge of their duties. By the inventory which they subsequently caused to be filed, it appears that the testator left an estate amounting to nearly $200,000, the larger portion of which was invested in a profitable mercantile business, which was being carried on at Syracuse under the firm name of W. S. Peck & Co., of which firm both the testator and his brother were members at the time of the death of the former. The testator left, him surviving, a widow and four

minor sons, and they were the only beneficiaries named in the will, the widow receiving a larger portion of the estate than either of the children. By mutual consent, the administration of the testator's estate appears to have been mainly conducted by the appellant, Wilbur S. Peck. He received and paid out all moneys, settled all claims, and provided the widow and children with the means for their support, in accordance with the directions contained in his brother's will. In the course of administration, it became desirable to invest considerable sums of money belonging to the estate, in order that it might produce sufficient income to enable the executors to furnish the widow and children with proper support; and consequently loans were made from time to time on various kinds of securities, some of the investments thus made being taken by the executor, as a matter of convenience and upon the advice of counsel, in his individual name. In the course of time, the executor rendered his account, and thereupon the widow and the special guardian of the children filed objections to the same, in and by which they challenged the legality of certain investments made by the executor, amounting in the aggregate to about $70,000. But this amount was reduced nearly one-half by payments upon the investments thus made. A hearing was had before the surrogate, and, as the result thereof, the decree from which this appeal is brought was duly entered.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Horace White, for appellant.
D. A. Pierce, for respondent Elizabeth R. Peck.

ADAMS, J. Before entering upon the consideration of the principal question which we are asked to review in this case, it will be profitable to advert very briefly to some of its more important features concerning which there appears to be no dispute whatever; and first we are led to observe that no charge of fraud or bad faith is made against the appellant. On the contrary, it is virtually conceded that, in whatever he has done, he has acted from the best of motives, and with the sole desire to so administer the estate of his testator as to increase its value to the beneficiaries named in the will. It is undoubtedly true that, in his efforts to accomplish this result, he made some investments of the trust funds in his hands which can hardly be sanctioned by a court of equity; but it is a curious fact that these investments, with one or two insignificant exceptions, have proved to be valuable ones, from which the estate has derived a larger income than would have been the case had the moneys been deposited in a bank. Again, it is to be noted that not only is the element of bad faith absent from the case, but there appears to be no disposition upon the part of the appellant to either conceal or palliate the irregularity of his transactions; for, upon the accounting, he stated that he had made investments which were, strictly speaking, illegal, and admitted with commendable frankness that he should be charged personally with such of those investments as had been made upon his own responsibility and without the acquiescence of his co-executor. But just here the line is drawn, and it is insisted that, as to certain other investments which were the subject of inquiry upon the accounting, the executrix should not be permitted to escape all responsibility, inasmuch as such investments were made with her knowledge and consent. We are thus brought to a consideration of the sole question in the case, which is: To what extent, if at all, is Mrs. Peck chargeable

with the consequences of any improper dealings with the assets of
the estate by her co-executor?

There can be no doubt, we think, as to the rule which should govern
in cases of this character, which is that where one executor knows, or
has the means of knowing, of irregular investments by a co-executor,
and assents thereto, either expressly or passively, he cannot, in the ab-
sence of fraud or misrepresentation, escape responsibility therefor.
In re Niles, 113 N. Y. 547, 21 N. E. 687. And in this case, as in the
one just cited, the question is not complicated by the dual capacity
of Mrs. Peck, because here, as there, it may be said that:

> "The elements of concurrence, of knowledge, or of acquiescence in the indi-
> vidual are equally available to the administrator [executor, Peck], as weak-
> nesses in either position she may take in her attack upon him." In re Niles,
> supra.

The learned surrogate has found that, as to certain investments
made by her co-executor, Mrs. Peck certainly did acquiesce; for in
one or two instances they were taken in her name, and it is said that
as to some others she would have to be held liable but for the fact
that the beneficiaries under the will do not seek to charge her with
liability. In reaching this conclusion we think the learned surrogate
has overlooked two very important facts, one of which is that Mrs.
Peck is herself a beneficiary under the will of her husband, and the
other is that this is a settlement between her and her co-executor, in
which she is seeking to divest herself of all responsibility for irregu-
larities of administration in which she appears to have participated.
Without going very much into detail, we think the evidence contained
in the record before us shows quite conclusively that while, as has al-
ready been stated, the principal management of the estate was left to
the appellant, he frequently consulted Mrs. Peck in regard to his
official transactions, and she knew in a general way, and had ample
opportunity to know in each particular instance, how the estate was
being managed, what investments were being made, and the income
which was being derived therefrom. On one occasion, just before she
departed for Europe, Mr. Peck furnished Mrs. Peck with a statement
showing the amount of moneys remaining in his hands and the securi-
ties which had been taken by him. On another, a loan of $25,000
was made at the special instance and request of Mrs. Peck. A part
of the consideration for the purchase of the Crouse avenue property
was a mortgage upon what is known as the "Granby Lots," which was
executed by Mrs. Peck. In short, the appellant testified that he
"never made any transactions while she [Mrs. Peck] was here that she
did not know of"; and the evidence seems to bear out this assertion.
In these circumstances, we are not satisfied that any foundation is
furnished for holding the appellant solely liable for the consequences
of his acts.

This case in its essential features is singularly like the Niles Case,
supra, in which letters of administration were issued to a Mrs. Miller,
a daughter of the intestate, and one Nathaniel Niles, a lawyer and
an old friend of the family. The management of the estate was
intrusted to Niles, just as it was to Peck in the present case; and,
upon his accounting, Mrs. Miller attempted, as Mrs. Peck is now at-

tempting, to relieve herself from all responsibility for the consequences of her co-administrator's maladministration; and the court, in referring to the relation which the parties occupied towards each other, and the reciprocal obligations which that relation imposed, made use of this significant language, which is quite as applicable to the present case as to the one in which it was employed:

"Now, what was Mrs. Miller's position in this case? She was co-administratrix, and at the same time the next of kin and prospective distributee of two-thirds of the estate. Niles was joined with her to aid her in the office, which she could have filled alone. Except that she chose to leave the custody and management of the affairs of the estate to her co-administrator, she was at all times a factor in the administration, and was legally chargeable with what was done therein, in the absence of any fraudulent practices of deception or concealment upon her by her co-administrator. She had frequent consultations with him, and at various times sought and obtained information as to the affairs of the estate. There is no evidence that she was in any sense excluded from the administration by Niles. She relied upon his judgment, and, by her own testimony, we are informed that she 'never failed, whenever he told her anything about investments, to assent to it.' At another time she says: 'I did not object to any one of these investments when I heard of it.' There is enough in this record to show that, if not in all instances, in many she knew of the investments which were made by her co-administrator; and, if she did not concur, either she assented, or, by raising no objection, acquiesced. Her attempt to distinguish between authorizing and directing an act of the other administrator, and assenting to it when done, is quite futile and ineffectual for any purpose here. Upon her, equally with her associate in the office of administration, rested the duty to be vigilant to guard the estate from waste, loss, and impairment. Having sought the office, while she remained in it she could not stand by and see an improper use made of the assets, and thereafter claim immunity in her official capacity, or advantage in her private capacity; whether such claim should be grounded upon ignorance of her legal duties and rights, or upon her mistaken reliance upon her associate in office. * * * We hold, therefore, that just so far as Mrs. Miller had the means of knowing of her co-administrator's acts, and assented to or acquiesced in them, she is bound. The question is merely between the two. Where concurrence in the action of Niles can be proved, or, with adequate knowledge of it, she is proved to have assented expressly, or by her passiveness should be deemed to have acquiesced, in it, as co-administratrix she is chargeable with its consequences, and as beneficiary she is estopped from objecting to it; provided that she is unable to prove fraudulent practices by Niles, by which she was misled and deceived as to the facts of each transaction." In re Niles, 113 N. Y. 557–559, 21 N. E. 689.

With the rule of law thus stated in mind, we are unable to discover upon what theory the decision of the learned surrogate can be sustained; and we are therefore constrained to reverse the decree entered upon his decision, and remit the case to the surrogate's court for further proceedings in accordance with the views herein expressed.

Decree reversed, with costs to the appellant, payable out of the estate. All concur, except GREEN, J., who dissents.